UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

DeJuan Haywood HAGGINS,                                    Civ. No. 10-4427 (DWF/LIB)

        Plaintiff,

v.                                                                        **REPORT AND RECOMMENDATION**

MN D.O.C. Commissioner et al,

        Defendants,

---

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the parties' cross motions for summary judgment and Plaintiff's Motion for a Temporary Restraining Order and Motions for Preliminary Injunction.  Plaintiff, Dejuan Haggins (Haggins), appears pro se and Defendants, Minnesota Department of Corrections Commissioner and various employees of the Minnesota Department of Corrections (DOC), appear by Jackson Evans, Assistant Minnesota Attorney General.  For the reasons set forth below, the Court recommends that Plaintiff's Motion for a Temporary Restraining Order and Motions for Preliminary Injunction be denied, Plaintiff's Motion for Summary Judgment be denied, and Defendants' Motion for Summary Judgment be granted.

## I.    BACKGROUND

Dejuan Haggins (Plaintiff) is an inmate confined to the custody of the Commissioner of the Minnesota Department of Correction.  (Aff. of Mary McComb [Docket No. 35] at 1-2).  He is currently housed at the Minnesota Correctional Facility at Oak Part Heights (MCF-OPH) in the administrative control unit (ACU).  (Id. at 2).

On November 1, 2010, Plaintiff filed this lawsuit against Defendants alleging the following claims: 1) Eighth Amendment violations for excessive force; 2) state tort claim for assault and battery; 3) First Amendment violation of rights to access the courts; 4) retaliation for legal activities; 5) Fourth Amendment violation for unnecessary strip search; and 6) Eighth Amendment violations for being left on quiet status for 14 days. (See Complaint [Docket No. 1] at 12). Additionally, Plaintiff seeks an injunction to abolish or re-write the "quiet status" policy.[1]

Plaintiff's claims primarily arise from four incidents that occurred in August of 2010: 1) the confiscation of carbon forms received in the mail by Plaintiff; 2) a restraint by officers of Plaintiff in one of the facility's recreation rooms; 3) an unclothed body search of Plaintiff in his cell; and 4) Plaintiff's placement on quiet status.

### 1.   Confiscation of Plaintiff's Carbon Forms

On August 1, 2010, Mike Green (Green), the mail supervisor at MCF-OPH, came to Plaintiff's cell to deliver Plaintiff's mail. (Compl. [Docket No. 1] at 13). Because the mail came from the United States District Court for Minnesota (and related to a different lawsuit by Plaintiff), it was considered legal mail; accordingly, Green opened and read Plaintiff's mail in front of him. (Id.) DOC policy 302.020 requires legal mail to be "opened and inspected only in the presence of the [inmate]" and also requires the deliverer to "skim the contents to ensure that it is legal/official in nature." (Aff. of Mike Green [Docket No. 33], Ex. 1 at 5). Upon opening the mail, Green discovered that "the envelope contained forms that were made of carbon paper." (Aff. of Mike Green at 2). Because "[t]he DOC prohibits an inmate from possessing carbon paper," which is "used to make prison tattoos" (also prohibited), Green took the carbon paper

---

[1] Plaintiff had also filed a motion for an injunction to be transferred from his current facility. (See Docket No. 16). However, in a subsequent filing, Plaintiff sought to "quash" the motion alleging that if he is transferred his property would be destroyed. (See Docket No. 38 at 3). The Court interprets Plaintiff's filing as a withdrawal of his motion for an injunction to be transferred from his current facility.

forms.  (Id.)  However, Green gave the Order included in the mailing to Plaintiff.  (Aff. of Mary

McComb, Ex. D).  Plaintiff filed a kite (a grievance through the administrative process)

regarding the confiscation of the carbon paper forms.  (Id.)  McComb replied to Plaintiff's

grievance on August 10, 2010: "The concern with the U.S. Marshal service forms was the carbon

paper. That is contraband in prison. I have since clarified your need for these forms with Mr.

Green and they will be returned to you."  (Id.)  In compliance with McComb's instruction, Green

returned the carbon paper forms to Plaintiff.  (Aff. of Mike Green at 2).  Upon their return,

Plaintiff was able to complete the forms, which were necessary for a summons in a separate

lawsuit, and the defendant in that case did not raise any affirmative defenses related to "service

of to the statute of limitations in their answer."  (Def. Mem. of Law in Supp. of Their Mot. for

Summ. J. [Docket No. 32] at 2).  Indeed, Plaintiff does not allege that he suffered any prejudice

in the other unrelated lawsuit as a result of the delay in receiving the carbon paper forms.

Rather, Plaintiff asserts that Green's actions were in retaliation for Plaintiff's other lawsuit.

(Compl. at 13).  Plaintiff alleges that upon opening the mail, Green told him "you're not suing

anybody here."  (Compl. at 13).  Plaintiff also claims that Green then walked away and called

him a racial slur.  (Id.)

### 2.  Officers' Restraint of Plaintiff in the Recreation Area

On August 5, 2010, Officer Jeff Danski, a member of the DOC staff, was contacted by

the human resources manager from Clear Channel Radio regarding a threatening letter that

Plaintiff had sent to the radio station (a copy of the letter was included in Officer Danski's

report).  (Aff. of Mary McComb, Ex. E).  On August 6, Officer Danski approached Plaintiff,

while he was in the recreation room of his unit, and directed him to "cease communication to six

(6) radio stations represented by Clear Channel Radio" and informed him that he would be

disciplined for the threatening letter.  (Id.); (see Compl. at 14).  Plaintiff alleges that Officer

Danski also told him "[y]our cell's getting cleared out, you're getting your ass kicked and you

drop that suit."  (Id.)  However, absent the incident described below, Plaintiff does not factually

allege that any of the alleged threats were acted upon.

      Eight separate reports from prison officials describe what happened after Officer Danski

left the room.  (Aff. of Mary McComb, Ex. G).  Plaintiff began yelling for Officer Danski to

return and made threatening remarks towards prison officials.  (Id. at 1).  As result of his actions,

Plaintiff's recreational time was terminated.  (Id.)  Officer Tony Quinn directed Plaintiff to "cuff

up,"[2] so that he could be restrained and taken to his cell.  (Id.)  Plaintiff refused to comply with

the directives.  (Id.)  Because Plaintiff was "yelling that he wanted to fight," Officer Quinn called

for additional officers to come assist.  (Id.)  After Plaintiff again refused to comply several more

times with Officer Quinn's directives, the team decided that they would have to enter as a team

to restrain Plaintiff, who, at this point, was wrapping his face and fists in clothing.  (Id.)  A

chemical irritant was then sprayed into the room, in an attempt to gain Plaintiff's compliance, at

which time Plaintiff pointed at the staff and motioned for them to come in.  (Id.)  Officers again

gave him directives several more times to cuff up and waited for several minutes for Plaintiff to

comply—Plaintiff again refused to comply.  An entry team of six officers came in to restrain

Plaintiff, but Plaintiff continued to actively resist—in fact, as soon as the door was opened,

---

[2] The "cuff up" procedure is used to safely and securely restrain an inmate with the least likelihood of an injury to either staff or the inmate:

> When an inmate is told to 'cuff up' the inmate must come to the exterior door of his cell, turn his back towards the door and place his hands through a slot in the exterior door.  DOC staff then place handcuffs on the inmate's hands.  This procedure allows the DOC staff member to stay safely on the other side of the door from the inmate while the inmate is unrestrained.  Once the inmate is handcuffed, a DOC staff member unlocks and opens the door.  The inmate backs up as the door opens.  This procedure allows DOC staff members to maintain control of the inmate and reduces the risk of the inmate assaulting a DOC staff member.

(Aff. of Mary McComb at 3).

Plaintiff charged and attacked the entry team in a linebacker like manner.  (Id.)  He was placed in "full HLC restraints and spit mask."  (Id.)  Defendants also applied "Cool It" to Plaintiff to ease any irritation from the chemical irritant.  (Id.)

Plaintiff's description of the event differs.  Plaintiff admits that he "refused to go anywhere with the staff."  (Compl. at 14).  He alleges, however, that he continually offered no resistance, that he was slammed to the ground and that he had his pants "yanked down" in the recreation area.  (Id.)

The restraint was recorded by an officer on a hand-held videotape and was also recorded on "the stationary camera positioned in the recreation area."  (Aff. of Mary McComb at 2).  The footage from both cameras confirms the eight officers' account of the incident.  (Aff. of Mary McComb, Ex. H).  The footage shows Plaintiff pacing the room—while staring at the officers— immediately before the officers entered, and then shows Plaintiff running and "spearing" the officers upon their entry.  (Id.)

### 3.   Officers' Unclothed Search of Plaintiff in Plaintiff's Cell

After the restraint in the recreation room, Plaintiff was taken to a cell in the segregation unit where an unclothed body search was performed upon him.  (Aff. of Kevin Monio [Docket No. 34] at 1-2).  The search was performed pursuant to Division Directive 301.010, which authorizes unclothed body searches of prisoners upon reasonable suspicion, and pursuant to Division Directive 301.083, which prescribes such a search prior to an inmate being placed on quiet status.  (Aff. of Kevin Monio, Ex. 1 at 2).  Officer Monio provided in his affidavit that Plaintiff's immediately preceding aggressive behavior in the recreation room provided a reasonable suspicion that Plaintiff had contraband because "[t]he recreation room is an area that is shared with other inmates and inmates have previously utilized the recreation room to smuggle

drugs, weapons, and messages." (Aff. of Kevin Monio at 2). Officer Monio also stated that the search was further necessary to ensure that Plaintiff was "not concealing any items that were not allowed on quiet status." (Id.)

Immediately after the search, upon Plaintiff's complaints of pain in his wrists, Plaintiff was seen by a nurse in his cell. (Aff. of Mary McComb, Exs. H-J). The medical report written by the nurse provides that Plaintiff suffered only minor injuries. (Aff. of Mary McComb, Ex. J). Although Plaintiff made complaints of wrist pain while being evaluated by the nurse, he "otherwise voiced no medical concerns," and the nurse observed "no visible outward injuries." (Id.)

After the nurse evaluated Plaintiff, he was taken to the door so that his restraints could be removed. (Compl. at 16). Plaintiff alleges that he was "dragged backwards" and that officers continued to exercise excessive force upon him to cause him pain. (Id.) However, the video demonstrates that prior to moving Plaintiff from the bed where he was searched, officers described to him how they were going to move him, and any application of force was because of Plaintiff's continued noncompliance. Even after the door was closed, and officers were out of the room, Plaintiff continued to resist the officers' directives to get on his knees. Plaintiff also asserts that when his feet were allegedly caught in the door, one of the officers said "gotta show him we're not playing, that we're serious." (Id.) The video tape, which provides clear audio at this alleged time, reveals that no such comment was made to Plaintiff. (Aff. of Mary McComb, Ex. H).

Subsequently, on August 10, 2010, Plaintiff again requested to be seen by the nurse because of pain and numbness in his wrists. (Aff. of Mary McComb, Ex. J). The nurse noted that Plaintiff had a "small (1cm) skin tear" on his left wrist from the handcuffs but found that he

had "good flexion and extension" of both wrists and had only mild tenderness in his wrists.  (Id.)

Because Plaintiff also complained of headaches, the nurse requested that he be evaluated by a

doctor.  (Id.)[3]  On August 11, 2010, Dr. Stephen Craane, M.D., evaluated Plaintiff for his

complaints of wrist pain and headaches.  (Aff. of Mary McComb, Ex. K).  Although Dr. Craane

found several abrasions on Plaintiff's wrists, he noted that there was no active drainage or

bleeding.  (Id.)  He explained to Plaintiff that "it may take several weeks for the paresthesias to

resolve in [Plaintiff's] left hand, as he is likely contused in the nerve due to his struggles."  (Id.)

Dr. Craane did not determine that any further medical treatment was necessary and simply

informed Plaintiff to notify medical staff if he experienced any further difficulties.  (Id.)

### 4.  Plaintiff's Placement on Quiet Status

As a result of Plaintiff's disruptive and combative conduct during the restraint in the

recreation area, he was placed on quiet status on August 6, 2010.  (Aff. of Kevin Monio at 1).

During Plaintiff's restraint in the recreation room, and prior to bringing him back to his cell,

prison staff prepared Plaintiff's cell for quiet status by "remov[ing] [Plaintiff's] personal items

from his cell and [leaving] the allowable amount of clothing, bedding and hygiene items in his

cell."  (Id. at 2).  Officers intended to keep Plaintiff on quiet status "until [he] could demonstrate

that his behavior had stabilized."  (Id.)

The Minnesota Department of Corrections' Division Directive 301.083 describes the

function and purpose of quiet status.  (Aff. of Mary McComb, Ex. M).  The directive provides

that each incarceration facility "will provide a segregation unit that is separate from the general

population."  (Id. at 1).  "The segregation until is maintained primarily for the purpose of

separating offenders following the discipline process as penalty for facility rule violations,

---

[3] Plaintiff does not allege that his headaches were a result of the restraint incident, and based on the medical reports, Plaintiff had previously complained of headaches; as such, the Court need not address them in this case.

however, it also houses offenders on statuses referenced in this directive." (Id.) One of these

statuses is quiet status:[4] "[quiet] status [is] assigned to an offender placed in a specific room in

segregation and subject to restricted amenities due to destructive, disruptive, threatening or

acting out behaviors.  Placement on quiet status is normally of short duration with the offender's

subsequent behavior as a determining factor for length of placement." (Id. at 2).  In order to

place an offender on quiet status, staff must first write an incident report, and the "segregation

unit supervisor will determine if an offender will be placed in quiet status," but in the absence of

a segregation unit supervisor, the watch commander may make the determination. (Id. at 9).  If it

is determined that an offender's quiet status should extend beyond 10 days, the segregation unit

supervisor must consult with his or her supervisor and review the offender's status daily. (Id.)

The supervisor must also provide written notification to the offender when extending quiet status

beyond 10 days. (Id.)  The list of allowable items for offenders on quiet status includes "one set

of clothing, footwear, prescription eyewear, and the offender may have access to personal

hygiene items," though such items may be removed if "the behavior that resulted in placement

on quiet status was due to abuse of clothing items." (Id.)  Although the offender is not allowed

any phone time, visiting, or radio time, he is permitted three hours of exercise per week. (Id at

13).

       In accordance with the Directive's mandate that "[e]ach facility . . . develop operating

guidelines or instructions to implement [the] directive," MCF-OPH has established its own

segregation unit management directive. (Aff. of Mary McComb, Ex. N).  It provides that upon

entering the segregation unit, "all offenders will be assigned a cell and submit to an unclothed

body search." (Id. at 1).  All of the offender's personal property is "inventoried, labeled and

---

[4] The directive also provides for other statuses, which are aimed more specifically at discipline: disciplinary
segregation; restrictive disciplinary segregation; and administrative segregation.

stored in a secure area."  (Id.)  The "set of clothing" given to the offender includes four t-shirts,

four briefs, four pair of socks, two shirts, two pair of pants, and one pair of slip-on tennis shoes.

(Id. 1-2).  The directive further explains that "[p]lacement on quiet status is for control purposes

only and is not intended for use as punishment for minor infractions."  (Id. at 12).  While on

quiet status, an offender is allowed to make only telephone calls to legal counsel and may only

receive first class mail.  (Id. at 12-13).

During his time on quiet status, Plaintiff "continued a pattern of disciplinary violations

that displayed disruptive and threatening behavior."  (Aff. of Kevin Monio at 2).  On August 7,

2010, while on quiet status, Plaintiff pressed the duress button on the cell and asked to be moved

to a different cell.  (Aff. of Mary McComb, Ex. O and Q).  His request was denied because

Plaintiff offered no medical reason, nor any other compelling reason, to be moved.  (Id.)  Shortly

thereafter, Plaintiff again activated his distress button and stated that his toilet was clogged.  (Id.)

He further explained that it was clogged because he "threw a roll of toilet paper into the toilet

[while] he had been cleaning the room."  (Id.)  To allow staff to unclog the toilet and clean the

room, Plaintiff was moved into a different cell.  (Id.)  When staff informed him that he would

have to go back to his previous cell once it was cleaned, he stated "You'll have to fight me, I'm

not moving back there, I'm not moving back to that cell."  (Id.)  Eventually, a hearing was held

for each of these incidents and Plaintiff was placed on segregation for 30 days for his actions.

(Aff. of Mary McComb, Ex. R).

Although duress buttons are supposed to be used only in the case of an emergency, Aff.

of Mary McComb at 4, on August 8, 2010, while in quiet status, Plaintiff activated his duress

button four times for non-emergency reasons.  (Aff. of Mary McComb, Ex. S).  On August 10,

2010, Plaintiff engaged in verbal abuse toward DOC staff and called them a derogatory term.

(Id.)  On August 11, 2010, when DOC staff informed him that he would be placed on "paper policy" as a result of his actions in clogging the toilet, he again engaged in verbal abuse towards the staff member, referred to him by racially offensive terms, and made sexually explicit remarks regarding the staff member's wife.  (Aff. of Mary McComb, Ex. U).  When he was asked later that day whether he wished to attend his disciplinary hearing, he told the staff member that the hearing officer, Mike Green, "can die and go to hell."  (Aff. of Mary McComb, Ex. V).  On August 12, 2010, Plaintiff again pressed his duress button for a non-emergency reason.  (Aff. of Mary McComb, Ex. W).  When staff responded, he said "You tell Mike Green I am going to whoop that white motherf___ers ass when I get a chance."  (Id.)  On August 15, 2010, while Officer Hope Briles was serving dinner to the inmates in the unit, she heard Plaintiff swearing and speaking about her and closed his door.  (Aff. of Mary McComb, Ex. Z).  Shortly thereafter, Plaintiff hit his duress button, for a non-emergency, and again stated that he would "whoop Mike Green's ass up and down the Hallway," and made sexually explicit references and threats about Officer Briles.  (Id.)  In accordance with the quiet status directives, Officer Monio "consulted with Lcie Stevenson, the ACU Program Director, and [they] authorized a continuance of [Plaintiff's] quiet status."  (Aff. of Kevin Monio at 2).  From August 16 to August 18, Plaintiff did not commit any disciplinary violations.  (Aff. of Mary McComb at 6).  As such, Plaintiff's behavior was considered "stabilized" and on August 19, 2010, because he was "no longer a threat to the penological security of MCF-OPH," he was removed from quiet status.  (Aff. of Kevin Monio at 3).

## II.     THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

### 1.  Standard of Review

Summary Judgment is appropriate only when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006). A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).  However, the nonmoving party may not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  "Naked assertions, unsubstantiated by the record," made in rebuttal do not amount to sufficient evidence to preclude summary judgment.  Dutton v. University Healthcare Sys., L.L.C., 136 Fed. Appx. 596 (5th Cir. 2005) (unpublished decision); see also Simms v. McDowell, No. 4:08cv-60-M, 2009 WL 3160353, at *5 (W.D. Ky. Sept. 25, 2009) (holding that speculation that someone lied in an affidavit is "insufficient to defeat a motion for summary judgment.").  "A properly supported motion for summary judgment is not defeated by self-serving affidavits."  Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cnty Med. Ctr.,

550 F.3d 711,716 (8th Cir. 2008)).  "Rather, the plaintiff must substantiate allegations with

sufficient probative evidence that would permit a finding in the plaintiff's favor."  Id. at 473-74.

The movant is entitled to summary judgment where the nonmoving party has failed "to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  No genuine issue of fact

exists in such a case because "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

### 2.  Discussion

Plaintiff did not file a substantive memorandum of law in support of his motion, but

instead asked the Court to construe his motion liberally given his pro se status.  The Court

accepts the Plaintiff's request and construes all of Plaintiff's motions and papers liberally, as it

must.  See Williams v. Carter, 10 F.3d 563, 567 (8th Cir. 1993) ("Pleadings and other documents

filed by pro se litigants should be treated with a degree of indulgence, in order to avoid a

meritorious claim's being lost through inadvertence or misunderstanding").  However, liberal

construction of a pro se party's pleadings does not excuse them from complying with the

substantive law.  Brown v. Frey, 806 F.2d 801, 804 (8th Cir. 1986).  Each of Plaintiff's claims is

addressed below.

### i.   Plaintiff's Claims for Damages against the Department of Corrections and the individual Defendants, in their official capacities, are barred by the Eleventh Amendment

A suit against a public employee in that person's official capacity is merely a suit against

the public employer.  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)

(citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)).  "The Eleventh Amendment immunizes

an unconsenting State from damage actions brought in federal court, except when Congress has

12

abrogated that immunity for a particular federal cause of action." <u>Hadley v. North Arkansas Community Technical College</u>, 76 F.3d 1437, 1438 (8th Cir. 1996). "To waive sovereign immunity, a state must make a clear, unequivocal statement that it wishes to do so." <u>Faibisch v. University of Minnesota</u>, 304 F.3d 797, 800 (8th Cir. 2002).

In this case, Plaintiff has not established that Minnesota has waived its immunity from damages for any of the laws at issue in this case, nor has he established that Congress abrogated Minnesota's immunity with respect to any of the claims at issue. Indeed, Plaintiff does not dispute Defendant's sovereign immunity argument. Because the DOC is "an arm of the state," and the Eleventh Amendment applies to an instrumentality of a state, it is irrelevant that the DOC, and not the State of Minnesota, is the party in the suit. <u>Jones v. Minnesota Dept. of Corrections</u>, No. 05-1249 (RHK/AJB), 2006 WL 3102984, at *5 (D. Minn. Oct. 31, 2006). Furthermore, Eleventh Amendment immunity, "extends to *all* claims for money damages asserted against a state in federal court, including tort claims brought under state law." <u>Id.</u> (emphasis in original). Therefore, the immunity applies to Plaintiff's state-law assault and battery claim as well.

As such, to the extent that Plaintiff seeks money damages from Defendants in their official capacities, such claims should be dismissed. <u>See</u> <u>id.</u> (holding that the Eleventh Amendment barred Plaintiff's claims against the Minnesota DOC for indifference to medical needs; "Eighth Amendment excessive-force concerning the staff-assisted, unclothed body search; and a state-law wrongful death claim.").

        **ii.**      **Plaintiff's Claims against Defendants, in their individual capacities**

Defendants argue that the government officials, in their individual capacities, are entitled to qualified immunity from any Section 1983 liability.  (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. [Docket No. 32] at 25).

Upon a defendant's assertion of qualified immunity, the Court "must perform two inquiries in 'proper sequence.'"  Coleman v. Parkman, 349 F.3d 534, 537-38 (8th Cir. 2003). First, the Court asks "whether, when viewed in the light most favorable to the plaintiff, the alleged facts show the official's conduct violates a constitutional right."  Id. at 538.  If the answer to this first question is no, the Court should "proceed no further."  Id.  If the answer is yes, the next sequential step is to ask whether the right was clearly established.  Id.  Because the Court concludes, as more fully discussed below, that the answer to the first question is no, it need "proceed no further" in its analysis of qualified immunity.  For the reasons sets forth below, the Court finds that qualified immunity bars Plaintiff's damages claims against the individual defendants in their individual capacities. .

### iii.    Plaintiff's Claim of Retaliation Regarding the Carbon Forms

Construing Plaintiff's pleading liberally, it appears that he is alleging that Defendant Green acted in retaliation based on Plaintiff's present lawsuit when Green gave Plaintiff the Order received from the U.S. District Court in the mail, but initially took the carbon forms also sent to Plaintiff in that same mailing.  Green admits that he did not provide the carbon forms to Plaintiff, but he denies any improper motive.  (Def. Mem. of Law in Supp. of Their Mot. for Summ. J. at 13).

To establish a prima facie case of retaliatory discipline, the Plaintiff must show that: "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline."  Haynes v.

Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009).  The discipline does not need to be a specific

formal discipline, but must be an "adverse action against him that would chill a person of

ordinary firmness from continuing in the activity."  See Revels v. Vincenz, 382 F.3d 870, 876

(8th Cir. 2004).  Regarding the motivation element, the plaintiff must show that "the adverse

action was motivated at least in part by the exercise of the protected activity."  Id.; Jones v.

Johnson, No. 4:05CV00962 (BSM/BD), 2008 WL 4277720, at *5 (E.D. Ark. Sept. 15, 2008).

"The causal connection is generally a jury question, but it can provide a basis for summary

judgment when the 'question is so free from doubt as to justify taking it from the jury.'"  Revels,

382 F.3d at 876 (quoting Naucke v. City of Park Hills, 284 F.3d 923, 927-28 (8th Cir. 2002)).

Plaintiff has a "heavy evidentiary burden to establish a prima facie case" and "[m]erely alleging

that an act was retaliatory is insufficient."  Meuir v. Greene County Jail Employees, 487 F.3d

1115, 1119 (8th Cir. 2007).  Plaintiff has a "substantial burden of proving actual motivating

factor for adverse action was as alleged."  Halfacre v. Cruseturner, 299 Fed. Appx. 609, at *1

(8th Cir. 2008) (unpublished decision).  Furthermore, "allegations of retaliation must be more

than speculative and conclusory,"  Id.

Defendants do not dispute that Plaintiff established the first element.  (Def. Mem. of Law

in Supp. of Their Mot. for Summ. J. at 12).  The filing of an inmate lawsuit is a protected First

Amendment activity.  Haynes, 588 F.3d at 1155-56.

Regarding the second element, Defendants argue that Plaintiff was not "disciplined" for

receiving the carbon paper forms.  (Def. Mem. of Law in Supp. of Their Mot. for Summ. J. at

12).  They argue that no adverse action was taken against him "in terms of his living conditions"

and his forms were "timely returned to him."  (Id.)  The taking of an inmate's legal papers can be

a constitutional violation when it infringes his right of access to the courts.  Goff v. Nix, 113

F.3d 887, 892 (8th Cir. 1997).  "[P]rison officials may not impede access to courts through retaliation, such as harassment or less favorable treatment for inmates' litigation activities." Beaulieu v. Ludeman, No. 07-CV-1535, 2008 WL 2498241, at *8 (D. Minn. Jun. 18, 2008). However, Plaintiff does not allege that his access to the courts was impeded (based on the carbon forms mail incident) or that the short delay in the return of the carbon forms to him caused him any prejudice in his other unrelated lawsuit.  Plaintiff's conclusory accusation regarding Mike Green's statement is the only evidence in the record that alleges that the carbon paper forms were taken to discipline Plaintiff.  Plaintiff does not allege that animosity, prior to this incident, existed between Plaintiff and Defendant Green, nor did Plaintiff provide any basis for why Defendant Green would act out in retaliation.  Instead, Plaintiff alleges in a conclusory manner that Green took the forms to prevent Plaintiff from continuing his lawsuit and called him a racial slur.  Plaintiff's claims are otherwise unsupported by any evidence in the record that would demonstrate a motive for Defendant Green to prevent Plaintiff from continuing his other lawsuit. Plaintiff does not allege that the other lawsuit is against Defendant Green, that the complaint in that other lawsuit states any claims against Green, nor does Plaintiff claim that Green is any way involved in the other lawsuit.  Moreover, Plaintiff fails to explain why Defendant Green would have given Plaintiff the Order (which Plaintiff did not include in his briefing but admitted in his administrative grievance) but not the carbon forms if Defendant Green was indeed attempting to prevent Plaintiff from continuing his other lawsuit.  As such, the Court finds that Plaintiff's mere conclusory allegation is insufficient to survive summary judgment.  Furthermore, regardless of the allegation, the Warden and Defendant Green have demonstrated that the carbon paper forms were properly taken in accordance with the facility's policy to prevent prison tattoos.  Thus, no

action was taken to discipline Plaintiff; and on the present record, Officer Green was instead merely following DOC policy.

Even if, however, the Court were to find that the taking of Plaintiff's carbon paper forms pursuant to the prison's policy constituted an adverse action, Plaintiff would be unable to meet the third element.  Plaintiff must show that "but for a retaliatory motive" the prison official would not have taken the adverse action.  Haynes, 588 F.3d at 1156.  As already discussed, Defendant Green's actions were pursuant to the prison's policy against carbon paper forms. Because Defendant Green gave Plaintiff the Order portion of Plaintiff's mail that was not against policy and confiscated only the carbon paper forms pursuant to the DOC policy, the carbon paper forms would have been taken regardless of any retaliatory motive.

Therefore, the Court finds that Plaintiff's carbon paper forms were not taken in a retaliatory action against Plaintiff and summary judgment is appropriate on this claim.

### iv.   Plaintiff's Claims Regarding His Restraint in the Recreation Area

A liberal construction of Plaintiff's pleadings, specifically that Defendant Danski and other staff came to him in the recreation room to tell him that his "cell [was] getting cleared out" and told him to "drop that suit," appear to raise a retaliation claim for the filing of his suit.[5] (Compl. at 14).  Plaintiff argues that the "squad defendants acted with a malicious state of mind and intent; brutally attacking the plaintiff for retaliatory purposes, at the direction of defendant Danski."  (Pl.'s Mot. for Summ. J. at 2).

"[An inmate's] retaliation claim is precluded [when] the punishment in question was imposed against him based on an actual violation of prison rules."  Earnest v. Courtney, 64 F.3d

---

[5] On page twelve of his complaint, Plaintiff made a claim for "retaliation for legal activities."  (Compl. at 12). Because no other references were made to the confiscation of the carbon paper forms on that page, Plaintiff appears to be referring to his claim of improper confiscation when claiming "retaliation for legal activities."  However, the Court will give a liberal reading of the claims and presume that Plaintiff also meant to allege a claim that the restraint was also made in retaliation.

365, 367 (8th Cir. 1995); see also Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990).  The

available video surveillance shows that the need for Plaintiff's restraint, as more fully described

above, arose entirely because of Plaintiff's own disruptive conduct in the recreation area.  Even

then, officers gave several directives and orders for several minutes in an attempt to gain

Plaintiff's compliance before any physical restraint was taken against him.  Plaintiff not only

refused the directives but made threats towards the officers and demonstrated combative

behavior.  Plaintiff was eventually disciplined for his conduct by being placed on quiet status.

(Aff. of Kevin Monio at 1).  Plaintiff cannot now establish a retaliation claim when the officers'

conduct was merely a response to his refusal of their orders and violation of prison rules.  See

Earnest, 64 F.3d at 367; Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006) ("If the

discipline which a prisoner claims is retaliatory was in fact imposed for an actual violation of

prison rules or regulations, the prisoner's claim must fail.").[6]

Plaintiff also alleges that during the restraint, officers used excessive force in violation of

the Eighth Amendment.  (Compl. at 12).  "[A] prison official violates the Eighth Amendment

only when two requirements are met": 1) "the deprivation alleged must be, objectively,

'sufficiently serious'"; and 2) the "prison official must have a 'sufficiently culpable state of

mind.'"  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Thus, the test provides an objective and

subjective element.  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008).  Regarding the first

---

[6] Though again unclear that Plaintiff is alleging a claim of retaliation in regard to being placed on quiet status, to the
extent that he does, it is without merit.  Plaintiff's placement on quiet status was a direct result of his disruptive and
combative conduct in the recreation area, despite his allegation that he "did not do anything to be placed on quiet
status."  (Pl.'s Resp. to Defendant's Mot. for Summ. J. [Docket No. 41] at 12).  Although Plaintiff makes conclusory
allegations that he was placed on quiet status in retaliation and that quiet status is used by Defendants for non-
security reasons, the evidence on the record demonstrates that Plaintiff was not placed on quiet status for any of
these alleged improper purposes.  Plaintiff does not allege that he was placed on quiet status prior to his conduct in
the recreation area.  "Even at summary judgment, 'the burden is on the prisoner to prove that but for an
unconstitutional, retaliatory motive,'" the action would not have been taken.  Webb v. Hedrick, 409 Fed. Appx. 33,
35 (8th Cir. 2010) (unpublished decision).  The reason for placing Plaintiff on quiet status is the same as the reason
that the officers needed to use restraint against him: his disruptive and noncompliant behavior.  Because Plaintiff
cannot state a claim of retaliation for actions taken in response to a violation of prison rules, his retaliation claim
regarding quiet status, to the extent he makes one, must also fail.

element, the Eighth Circuit has held that "not every push or shove violates the Constitution, but any use of force greater than *de minimis*, or any use of force that is 'repugnant to the conscience of mankind,' does." Id. "No clear line divides *de minimis* injuries from others." Id. at 448. The second element, in excessive force claims, requires a determination whether the force was used "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 446 (internal quotation marks omitted); see also Muhammad v. McCarrell, 536 F.3d 934, 938 (8th Cir. 2008). Because the second element is "the core judicial inquiry," the Court addresses that element first. Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000). "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment." Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir. 1996) (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).

Under the second prong, the Court considers "whether there was an objective need for force, the relationship between the need and the amount of force used, the threat reasonably perceived by correctional officers, the efforts by the officers to temper the severity of the forceful response, and the extent of the inmate's injuries." Hamilton, 452 F.3d at 972. Because "the use of force is sometimes required in prison settings," Irving, 519 F.3d at 446, courts frequently uphold officers' ability to use physical force to restrain noncompliant inmates. See, e.g., Hamilton, 452 F.3d at 972; Jasper v. Thalacker, 999 F.2d 353, 354 (8th Cir. 1993) (use of a stun gun to subdue a combative prisoner, even when four guards were present, was not excessive force).

All factors indicate that the officers used reasonable force in restraining Plaintiff. First, there was an objective need to apply physical force to restrain Plaintiff. Prior to the team's entry, Plaintiff had threatened the officers with violence. He also continually displayed combative

behavior by pacing back and forth while looking and pointing at the officers.  He prepared himself for an expected combative situation by wrapping his fists and face in clothing.  Moreover, immediately upon opening the door, Plaintiff initiated a running charge at the group of officers and attempted to tackle them.  Given the continued refusal to comply with the officers' directives and orders, and Plaintiff's combative behavior, the officers had an objective need for the use of force.  The force applied to Plaintiff was limited only to take him to the ground so that he could be handcuffed and restrained.  At no time did the officers maliciously strike or kick Plaintiff, nor did they taunt him or curse at him.  In fact, after having him restrained, they applied an agent to ease any irritation Plaintiff might have experienced from the chemical agent that had been deployed.  Given the objective need for the restraint, the limited amount of force used to take Plaintiff to the ground was not excessive.

The next factor also demonstrates that the force was not excessive.  Because of Plaintiff's combative conduct and threats towards the officers that day, the threat to their safety was real and reasonable—as demonstrated by Plaintiff's self-initiated charging attack on the officers.  If the officers were not wearing protective gear and did not enter as a large group, Plaintiff's attack could certainly have injured an officer.  The officers also took efforts to temper Plaintiff's response.  They directed him to approach the door so that he could be safely restrained; he refused.  They attempted to gain his compliance by first spraying a chemical irritant in the room; Plaintiff again refused to comply.  Only after several more failed directives, and hopefully awaiting his compliance for several minutes, did the officers come into the room to physically restrain him.

The minimal and very limited extent of the injuries also suggests no excessive force.  In his pleadings, Plaintiff alleges that he suffered severe injuries as a result of the restraints

including: cuts on his arms, swelling and bleeding, nerve damage, and sharp pains and pops in his wrists.  (Compl. at 31).  However, the uncontradicted medical reports in the record by the nurse and doctor who examined Plaintiff demonstrate that Plaintiff did not suffer any permanent or severe injury to his writs as a result of the restraint.  Although several minor scrapes were observed by the medical staff, the doctor who evaluated Plaintiff did not prescribe any treatment and advised Plaintiff simply to voice any future concerns about his wrists.  Therefore, in this case, the force used by the officers, was "commensurate with the situation with which they were confronted and [it] was employed in a good faith effort to maintain or restore discipline."  Hamilton, 452 F.3d at 967.

Because the Court finds that the Plaintiff has failed to demonstrate any competent, admissible evidence that would satisfy the second prong, it need not address the first prong of whether Plaintiff's alleged injuries were objectively "sufficiently serious."  However, the Court notes, without deciding, that Plaintiff's injuries consisted only of some minor cuts and scrapes and some numbness which the examining doctor opined did not require medical treatment and would go away in a couple of weeks.  Although there is no "clear line," similar injuries have been held to be minor.  Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) ("[B]ecause some force was reasonably required to arrest and handcuff [the plaintiff], his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were de minimis injuries that support the conclusion that [the defendant] did not use excessive force."); Stenzel v. Ellis, 916 F.2d 423, 427 (8th Cir. 1990) (Bruises and abrasions that require no medical treatment and cause no permanent damage were regarded as minor); Hanks v. Prachar, No. 02-4045 (MJD/RLE), 2009 WL 702177, at *13 (D. Minn. Mar. 13, 2009) ("'Allegations of pain as a result of being handcuffed, without some evidence of more permanent

injury,' are insufficient to support a claim for excessive force.") (quoting <u>Hanig v. Lee</u>, 415 F.3d

822, 824 (8th Cir. 2005)).

Even after viewing the record evidence in the light most favorable to Plaintiff, the Court

concludes that no jury could find that the force used by the officers to thwart Plaintiff's self-

initiated attack towards them and to subsequently restrain him was not employed in a "good faith

effort to restore discipline," but was instead applied "maliciously and sadistically for the very

purpose of causing harm."  Plaintiff's mere allegations made in his limited pleadings cannot state

a claim for excessive force under the Eighth Amendment.  Furthermore, at his administrative

hearing, after he was told the alleged charges and circumstances regarding the restraint, Plaintiff

"did not dispute any portion of [the] report [and] simply stat[ed] that is what he had to do."[7]

Finally, Plaintiff argues that the Defendants' actions constituted an assault and battery

under state tort claims.  (Compl. at 12).  When the Court has dismissed all of Plaintiff's federal

claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction

over Plaintiff's state law tort claim.  <u>See</u> <u>Jones</u>, 2006 WL 3102984, at *10 ("Having concluded

that summary judgment must be granted in Defendants' favor on Plaintiff's federal claims

[regarding deliberate indifference to medical needs, excessive-force, and state-law wrongful

---

[7] Plaintiff argues in his response to Defendants' Motion for Summary Judgment that the Court cannot consider the videotape provided by Defendants in the sworn affidavit and that his claims that he was cooperating rather than resisting present triable issues of fact.  [Docket No. 41] at 8).  The Court disagrees.  Plaintiff provides no authority for this proposition and his argument is without merit.  This Court has previously considered videotapes provided in a sworn affidavit by prison officials on a summary judgment motion.  <u>See, e.g.</u>, <u>Jones</u>, 2006 WL 3102984, at *4 n.11 (considering evidence from a videotape by MCF-SHK personnel and granting summary judgment for defendants on a plaintiffs' excessive force claim regarding an unclothed body search performed by prison officials); <u>McRaven v. Sanders</u>, 577 F.3d 974, 983 (8th Cir. 2009) (citing to footage from a videotape in holding that the videotape raised an issue of material fact, which precluded summary judgment).  Furthermore, despite his conclusory allegations that the tape is false, Plaintiff provides no further evidence to support his allegation.  "Naked assertions, unsubstantiated by the record," made in rebuttal do not amount to sufficient evidence to preclude summary judgment.  <u>Dutton</u>, 136 Fed. Appx. 596; <u>see also</u> <u>Simms</u>, 2009 WL 3160353, at *5 (holding that speculation that someone lied in an affidavit is "insufficient to defeat a motion for summary judgment").  Although the alleged use of excessive force is generally an issue of fact, the Court finds that on the evidence presented, the record demonstrates that "no reasonable jury could conclude that the use of force . . . was unreasonable, punitive, arbitrary, malicious, or repugnant to mankind," and similar to the defendants in <u>Jones</u>, the "Defendants are entitled to summary judgment on Plaintiff's excessive-force claim."  <u>Jones</u>, 2006 WL 3102984, at *10.

death], the Court's original jurisdiction has been extinguished. Pursuant to 28 U.S.C. §

1367(c)(3), the Court may, *sua sponte,* decline to exercise supplemental jurisdiction over a

pendent state-law claim if it has dismissed all claims over which it has original jurisdiction.");

see also Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004).  In a case where "all

federal-law claims are eliminated before trial, the balance of factors to be considered under the

pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the

remaining state-law claims."  Johnson, 360 F.3d at 819 (quoting Carnegie-Mellon Univ. v.

Cohill, 484 U.S. 343, 350 n.7 (1988)).  For the same reasons as explained in Jones, the Court

declines to exercise supplemental jurisdiction and recommends that Plaintiff's state-law assault

and battery claim be dismissed without prejudice.

### v.    Plaintiff's Claims Regarding the Unclothed Search in His Cell

Plaintiff argues that his Fourth Amendment rights were violated when he was subjected

to an unclothed body search in his cell.  (Compl. at 12).  Defendants argue that the search was

performed pursuant to Division Directive 301.010, which authorizes unclothed body searches of

prisoners upon reasonable suspicion, and pursuant to Division Directive 301.083, which

prescribes such a search prior to an inmate being placed on quiet status.  (Aff. of Kevin Monio,

Ex. 1 at 2).  Officer Monio provided in his affidavit that Plaintiff's aggressive behavior in the

recreation room provided a reasonable suspicion that Plaintiff had contraband because "[t]he

recreation room is an area that is shared with other inmates and inmates have previously utilized

the recreation room to smuggle drugs, weapons, and messages."  (Aff. of Kevin Monio at 2).

Officer Monio also stated that the search was necessary to ensure that Plaintiff was "not

concealing any items that were not allowed on quiet status."  (Id.)

"The Fourth Amendment prohibits only those searches and seizures that are unreasonable." Goff v. Nix, 803 F.2d 358, 363 (8th Cir. 1986).  In evaluating the reasonableness of prison strip search policies, the Court must balance "the need for the particular search against the invasion of the personal rights that the search entails." Id. (quoting Wolfish v. Whitefish, 441 U.S. 520, 558 (1979)).

The need for the unclothed body search in this case was substantial.  This Court has previously found that the purpose of an unclothed body search is "to detect contraband or other items that a prisoner might use to inflict injury on [him]self, prison staff, or other inmates." Jones, 2006 WL 3102984 at *10.  As in Goff, the prisoners placed on quiet status are inmates who are being placed in a segregation unit, if not already in one, "because of their inability to conform to the prison rules." 803 F.2d at 365.  "[W]e are not inclined to question what we believe are the legitimate concerns of prison administrators who have made considered decisions concerning the measures necessary to protect the prison staff and the prisoners themselves and to preserve the order necessary for the prison effectively to perform its mission." Id.  The United States Supreme Court and the Eighth Circuit have upheld the need for unclothed body searches on many occasions. See, e.g., Bell v. Wolfish, 441 U.S. 520, 558 (1979) (upholding visual body cavity searches of all pretrial detainees after contact visits with persons outside the prison); Goff, 803 F.2d at 365 (upholding a unclothed visual body cavity search policy that required such searches of inmates in segregation units before the inmate was taken to an exercise area); Franklin v. Lockhart, 883 F.2d 654 (8th Cir. 1989) (upholding a policy of strip searches twice daily on inmates on punitive status, "regardless of whether they have left their cells or had unsupervised contact with anyone"); Jones, 2006 WL 3102984 at *4 (upholding Minnesota DOC's policy to perform an unclothed body search upon intake to the facility).  It is well-

24

established that contraband such as weapons, drugs, and other items "are serious problems in our

nation's prisons." Goff, 803 F.2d 358.  Officer Monio provided that the recreation room in

which Plaintiff was located prior to the restraint "is an area that is shared with other inmates and

inmates have previously utilized the recreation room to smuggle drugs, weapons, and messages."

(Aff. of Kevin Monio at 2).  Given Plaintiff's demonstrated propensity for violence in this

case—as exhibited by his self-initiated attack on the officers in the recreation room and his

continued threats of violence upon prison staff while on quiet status—the Court can hardly

subvert the importance of searches to reasonable ensure that inmates on quiet status do not

possess any contraband.

Next, the Court considers the invasion of Plaintiff's personal rights.  Although unclothed

body searches "admittedly are intrusive and unpleasant, a prison inmate has a far lower

expectation of privacy than do most other individuals in our society." Goff, 803 F.2d at 365.

The search in this case was performed in Plaintiff's cell, not in an area where Plaintiff was on

public display to other inmates.  The search was only a visual body search, and Plaintiff does not

allege that any of his cavities were penetrated during the search.

The Court finds that the facility has a substantial need in performing unclothed body

searches for prisoners on quiet status, particularly in circumstances such as the ones present in

this case, and if the Court were to ban such searches, it would "disrupt well-established security

procedures in our prison systems and would no doubt engender greatly increased attempts to

smuggle contraband in what would have become specific bodily areas accorded a preferred

position under the Fourth Amendment." Goff, 803 F.2d at 366.  The Eighth Circuit has

previously explained that courts must be deferential when reviewing such policies because

> the management of corrections institutions is peculiarly the responsibility of the
> executive and legislative branches of government and . . . 'courts are ill equipped

to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.'

Goff, 803 F.2d at 362 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)).[8]

### vi.    Plaintiff's Claims Regarding His Placement on Quiet Status[9]

Plaintiff first argues that his placement on quiet status violated his Eighth Amendment rights. (Compl. at 12). The Eighth Amendment protects individuals from cruel and unusual punishment, and the Court, reading Plaintiff's pleading liberally, understands his complaint to be that quiet status caused him cruel and unusual punishment. The Court disagrees.

To demonstrate an Eighth Amendment cruel and unusual punishment claim based on living conditions, Plaintiff must prove that the "deprivation was sufficiently serious," and that the "defendant officials acted with a sufficiently culpable state of mind." Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1993). There is no question that the deprivation was done deliberately—it was done pursuant to policy of the prison. The relevant question, then, before the Court is whether the "deprivation was sufficiently serious."

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Brown v. Nix, 33 F.3d 951, 955 (8th Cir. 1994). The denial must be of the "minimal civilized measure of life's necessities." Id.; see also Rhodes v. Chapman, 452 U.S.

---

[8] The Court's finding on the substantial need and competing interests between the facility and Plaintiff also addresses Plaintiff's requests in his complaint that the Court enjoin the facility from performing any such searches in the future. (Compl. at 18). Because the Court finds that the DOC's policy is not unconstitutional, it also refuses to enjoin the DOC from applying its policy in the future. As such, it recommends that Plaintiff's request for injunctive relief be denied. See Oldham v. Chandler-Halford, 877 F. Supp. 1340, 1348 (8th Cir. 1995) ("Where there is no constitutional violation, there is no necessity for injunctive relief."); Fargo Women's Health Org. v. Schafer, 18 F.3d 526, 536 (8th Cir. 1994) ("Because we affirm the summary judgment for the State, we need not discuss the Organization's request for an injunction pending a trial on the merits.").

[9] The Defendants also allege that because Plaintiff's quiet status "overlapped with his time on restrictive segregation status," he would not have been allowed some of the privileges even if not on quiet status. (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. [Docket No. 32] at 22). However, because Plaintiff is only challenging the conditions imposed upon him pursuant to quiet status, and the Court finds that the conditions did not violate his constitutional rights, the Court need not address this argument.

337, 347 (1981).  "[C]onditions that cannot be said to be cruel and unusual under contemporary

standards are not unconstitutional.  To the extent that such conditions are restrictive and even

harsh, they are part of the penalty that criminal offenders pay for their offenses against society."

Rhodes, 452 U.S. at 347.

　　　　The denial of Plaintiff's certain rights and his conditions under quiet status did not

amount to an Eighth Amendment violation.  Plaintiff was allowed to possess several changes of

clothing; he was given footwear; he had a mattress, pillow, sheet, blanket, and towel.  (See Aff.

of Mary McComb, Ex. N at 12-13) (describing the allowable items and activities for an inmate

on quiet status).  He had personal hygiene items that included soap, a toothbrush, and toothpaste.

(Compl. at 15).  Although he had no visitation rights, he was allowed to make telephone calls

regarding legal matters.  He also had access to first class mail.  Under DOC policy, he was

allowed to exercise for one hour every Monday, Wednesday, and Friday, and he was permitted to

take a shower.  The conditions of Plaintiff's confinement on quiet status are far above any

unconstitutional standard, particularly considering that Plaintiff's placement on quiet status was

only temporary and its duration entirely within the control of Plaintiff who was responsible for

the way in which he acted to demonstrate that his disruptive behavior had "stabilized."  The

Eighth Circuit has previously upheld as constitutional conditions that were far harsher than those

imposed on Plaintiff in quiet status.  See, e.g., Oleary v. Iowa State Men's Reformatory, 79 F.3d

82, 83-84 (8th Cir. 1996) (a deprivation of underwear, blankets, mattress, exercise and visits did

not amount to an Eighth Amendment violation when an inmate could regain them "so long as

[he] demonstrate[d] satisfactory behavior."); Williams v. Delo, 49 F.3d 442, 445-46 (8th Cir.

1995) (rejecting an Eighth Amendment claim even when the water to the inmate's cell was

turned off, the mattress was removed, and bedding, clothing, legal mail and hygienic supplies were withheld).

To the extent that Plaintiff challenges the deprivation of his personal property, the argument also fails.  "One's right to possess personal property is severely diminished upon imprisonment" and there is "no constitutional right prohibiting prison officials from confiscating most of a prisoner's personal property pending release from prison," so long as it complies with due process.  Secret v. Brierton, 584 F.2d 823, 830 (7th Cir. 1978).  Here, Plaintiff does not allege a due process claim but an Eighth Amendment claim.  The confiscation of his personal items, during Plaintiff's temporary quiet status, in accordance with the prison's policy, did not constitute an infliction of pain under the Eighth Amendment.  See Hosna v. Groose, 80 F.3d 298, 305 (8th Cir. 1996) ("We find nothing unreasonable nor exaggerated in limiting the type of personal property in administrative segregation cells."); Howard v. Swenson, 314 F. Supp. 883, 884 (D.C. Mo. 1969), aff'd, 426 F.2d 277 (8th Cir. 1970) (finding that a seizure of a prisoner's shoes did not constitute cruel and unusual punishment); Bannan v. Angelone, 962 F. Supp. 71, 74 (W.D. Va. 1996) (explaining that "[u]nless other rights such as religion or speech are involved, jails may thus constitutionally disallow the possession of personal property" and holding that there is "nothing per se unconstitutional in disallowing the possession of certain items of property.").

Neither did his denial of general visitation rights under the temporary quiet status deny him his constitutional rights.  See Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (stating that "[a] prisoner does not have a liberty interest in contact visitation" and holding that the denial of the prisoner's visitation rights and exercise rights for 37 days did not violate the Eighth Amendment).  Nor did his restriction on the amount of exercise amount to a constitutional

violation.  See Hosna, 80 F.3d at 306 (holding that "a limitation of three hours per week of out-of-cell exercise [does not] necessarily violate the Constitution."); Wishon v. Gammon, 978 F.2d 446, 448-49 (8th Cir. 1992) (finding that even only 45 minutes of exercise per week did not violate the Eighth Amendment).  Plaintiff does not in the present case even allege that his "muscles [were] allowed to atrophy or [that his] health [was] threatened" by the amount of exercise he was allowed.  Wishon, 978 F.2d at 449.

Plaintiff also challenges his placement on quiet status because, he alleges, it amounted to a "violation of [his] right of access to courts."  (Compl. at 12).  Although he admits that he is allowed to receive first class mail while on quiet status, he argues that because of the restrictions on items while on quiet status, he would not be able to reply to any mail.  (Id. at 15).  Specifically, he alleges that because of being placed on quiet status, he was unable to reply in time to his other lawsuit by returning the carbon paper forms previously discussed.  (Id.)

In order to establish "a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." Hartsfield v. Nichols, 511 F.3d 826, 831-32 (8th Cir. 2008) (quoting White v. Kautzky, 494 F.3d 677, 680 (8th Cir. 2007)).  Because the second element, that there be an actual injury, "concerns the prisoner's standing to bring a claim," Court will consider it first.  White, 494 F.3d at 680.  To prove actual injury, Plaintiff must "demonstrate that a nonfrivoulous legal claim had been frustrated or was being impeded."  Id.  Plaintiff utterly fails to do so here.  Aside from his mere general claim that his return of the carbon forms in his other lawsuit was allegedly delayed, Plaintiff fails to allege that the delay caused him any prejudice in that other case.  The carbon

forms were received by the court on August 24, 2010, the court issued a summons upon their

receipt, and the defendants in that other case were served.  (Defs.' Mem. of Law in Supp. of

Their Mot. for Summ. J. at 24).  The defendants in that other case did not "raise any affirmative

defenses in their answer related to service or the statute of limitations."  (Id.)  Therefore, Plaintiff

has entirely failed to allege how he suffered an actual injury because of any delay caused by his

placement on quiet status.[10]

### III.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment

[Docket No. 25] be **DENIED**, that Plaintiff's motions for injunctive relief [Docket

Nos. 13 and 15] be **DENIED**, and Defendants' Motion for Summary Judgment

[Docket No. 31] be **GRANTED**.


Dated:  January 20, 2012                                     s/Leo I. Brisbois
                                                            LEO I. BRISBOIS
                                                            United States Magistrate Judge


### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation
by filing with the Clerk of Court, and serving all parties **by February 3, 2012**, a writing that
specifically identifies the portions of the Report to which objections are made and the bases for
each objection. A party may respond to the objections within fourteen days of service thereof.

---

[10] Because the Court finds that the DOC's quiet status policy is not unconstitutional, as applied in this case, it also
refuses to enjoin the DOC from applying its policy in the future.  As such, it recommends that Plaintiff's request for
injunctive relief be denied.  See Chandler-Halford, 877 F. Supp. at 1348 ("Where there is no constitutional violation,
there is no necessity for injunctive relief."); Schafer, 18 F.3d at 536 ("Because we affirm the summary judgment for
the State, we need not discuss the Organization's request for an injunction pending a trial on the merits.").
"Furthermore, a prisoner's claim for injunctive relief is moot if the prisoner is no longer subject to the conditions of
which he complained."  Chandler-Halford, 877 F. Supp. at 1348.  Plaintiff does not allege that he is still on quiet
status, and therefore, is no longer even subject to the conditions he alleges in his complaint.  The Court also notes
that the placement on quiet status is only a temporary placement, and moreover, the inmate holds the key to his own
release from that classification because it is dependent on his behavior.

Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.